***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Holmes with minor modifications.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the Plaintiff was 37 years old. In August 2001 Plaintiff was employed by Defendant as CNA II, a position she had held for approximately seven to eight months. Prior to commencing employment with Defendant-Employer, Plaintiff had been out of work for approximately four years raising her young children. Also, prior to commencing employment with Defendant, Plaintiff had a pre-existing medical history consisting of treatment for disabling migraine headaches, a closed head injury, depression, and neck pain.
2. Prior to August 12, 2001, Plaintiff's work performance was described as "poor" by Joyce Martin, an Assistant Director of Defendant. Additionally, Plaintiff had been counseled prior to August 12, 2001 for not obtaining her CNA license renewal.
3. On or about August 12, 2001, Plaintiff alleged that she experienced the onset of pain in her neck and across her shoulders when assisting a nurse with lifting a patient.
4. Following the aforementioned incident, Plaintiff did not request medical treatment from Defendant; however, she saw her family doctor, Dr. Pierre-Louis on August 13, 2001. She related a history of having moved a patient on August 12, 2001 and awakening on August 13, 2001 with stiffness of the neck and difficulty when she "moved her head in a certain position." Impression was cervical strain and Plaintiff was released to return to work activities which would not require heavy lifting. Plaintiff remained under the care of Dr. Pierre-Louis who subsequently excused Plaintiff from work activities from September 1 through September 9, 2001. Thereafter, employee did not return to see Dr. Pierre-Louis and began treating with Dr. Wolfe.
5. Plaintiff first saw Dr. Wolfe on September 13, 2001. Due to Plaintiff's continuing complaints, Dr. Wolfe, on or about September 27, 2001 referred Plaintiff for an MRI scan which was negative except for revealing evidence of cervical degenerative disc disease.
6. On or about October 4, 2001, Plaintiff was seen by Dr. Moore, an orthopaedic surgeon for further evaluation. Defendant authorized the Plaintiff's treatment with Dr. Moore and he became her authorized treating physician. Dr. Moore's impression following his examination of the Plaintiff on October 4, 2001 was that the Plaintiff was suffering from a cervical strain for which he recommended continued conservative treatment and released her to return to light duty work activities requiring no lifting greater than five pounds for one month. Dr. Moore otherwise placed no restrictions on Plaintiff.
7. Plaintiff was contacted by Joy Martin, the assistant director for Defendant on October 4, 2001 regarding her return to work at light duty and it was arranged that she would return to work in a light duty capacity at her regularly scheduled weekend times the following Friday, Saturday and Sunday. However, Plaintiff did not report to work activities as scheduled on either Friday, Saturday or Sunday nor did she call to inform Defendant that she would not be reporting to work. When Joy Martin spoke to Plaintiff on October 8, 2001, Plaintiff informed Joy Martin that she had over slept and "well, I just didn't call." Per the Plaintiff's report to Joy Martin, Plaintiff did not call anyone at the hospital on October 5, 6, or 7 to inform them that she would not be returning to work. It is Defendant's personnel policy that an employee is subject to termination for two no call/no shows.
8. Plaintiff remained under the care of Dr. Moore through March 4, 2002. During this period of time, Dr. Moore continued to release Plaintiff to return to light duty work activities which would not require her to lift more than 10 pounds. Dr. Moore rated the Plaintiff as having a 5% PPD rating to her back.
9. After failing to return to light duty work for Defendant in October 2001, Plaintiff located alternative employment at Quail Haven Nursing Home on November 19, 2001. Quail Haven has a skilled nursing facility and an assisted living facility. Job duties for nursing assistants at Quail Haven consist of helping clients with their baths and other activities of daily living, checking vital signs, answering call bells and performing light duty housework. In fact, the physical aspects of the job duties of a nursing assistant at Quail Haven are comparable to the light duty work which Defendant had offered to the Plaintiff in October 2001 and which the Plaintiff had refused to perform.
10. Plaintiff remained employed at Quail Haven from November 19, 2001 through June 2002. During this period of time, Plaintiff's wages varied depending on the number of days and hours that she worked. Plaintiff was under no restriction from Dr. Moore nor from Dr. Walsh, her later authorized physician, regarding the number of days or hours she could work. Plaintiff provided no medical evidence demonstrating that she was taken out of work by a medical provider or that she was unable to continue performing her work activities at Quail Haven. After Plaintiff voluntarily ceased her employment at Quail Haven, she has not looked for work but has resumed care for her four minor children. Furthermore, during this period of time, Plaintiff, in error, was paid temporary partial disability compensation benefits which should not have been paid because the Plaintiff unjustifiably refused employment suitable to her capacity which was offered her by Defendant. Therefore, Plaintiff has been overpaid temporary partial disability compensation benefits.
11. During the time Plaintiff was treated by Dr. Moore, his examinations revealed no evidence of upper extremity weakness and a full range of motion; however, a repeat MRI scan performed in January 2002 revealed some demyelinization for which Dr. Moore referred Plaintiff to Dr. Tellez for neurological evaluation. During his deposition testimony, Dr. Moore stated that he had no opinion as to when the demyelinization indicated on the MRI scan occurred and he also testified that when he last saw the Plaintiff in March 2002, that the Plaintiff's complaints of neck pain at that time could be related to another condition other than her cervical strain.
12. Dr. Tellez recommended that Plaintiff undergo a neurosurgical evaluation for Chiari Malformation, a condition unrelated to the August 12, 2001 incident.
13. Plaintiff was also authorized by Defendant to be treated by Dr. Walsh, a physiatrist, whom Plaintiff initially saw on April 18, 2002. Following his initial evaluation, Dr. Walsh recommended continued conservative treatment consisting of trigger point injections and reduced Plaintiff's work restrictions, releasing Plaintiff to engage in a full range of work activities which did not require lifting greater than 20 pounds. As of June 11, 2002, Dr. Walsh opined that Plaintiff had reached maximum medical improvement sustaining a 2% permanent partial impairment to her back. When Dr. Walsh released Plaintiff, she was continuing to be employed at Quail Haven.
14. On August 6, 2002, Plaintiff was seen by Dr. Hucks-Folliss upon referral of her attorney. On this occasion, Plaintiff reported a pre-existing history of neck problems. Dr. Hucks-Folliss' impressions following his examination were that the Plaintiff had the following conditions: degenerative disc disease, myofascial problems associated with stress; cervical strain and Chiari Malformation, which had not been aggravated by the strain. Dr. Hucks-Folliss opined that Plaintiff had sustained a 5% permanent impairment to her back as the result of her strain and felt that as of August 6, 2002, Plaintiff could engage in work activities which would not require her to lift greater than 25 to 30 pounds from bench height or 10 to 15 pounds from floor height and would not require her to engage in repetitive bending, stooping, lifting or overhead work activities.
15. Dr. Moore, the Plaintiff's authorized treating physician, released Plaintiff to return to light duty employment on October 4, 2001. However, the Plaintiff refused to return to work activities. Plaintiff's testimony that she was unable to work is not supported by the evidence of record.
16. On October 4, 2001, the Defendant contacted Plaintiff and scheduled her to return to light duty work activities within the restrictions as set forth by Dr. Moore of no lifting greater than 5 pounds. However, Plaintiff was a no call no show for three days.
17. Plaintiff has presented no evidence that she was unable to engage in the light duty work activities provided to her by the Defendant in October 2001.
18. Not only has Dr. Moore opined that employee could perform light duty work activities but Dr. Walsh and Dr. Hucks-Folliss have also opined that Plaintiff could engage in light duty work activities.
19. But for the Plaintiff's unjustifiable refusal of the Defendant's aforementioned offer of employment, the Plaintiff could have continued being employed by Defendant earning the same or greater average weekly wage that she was earning on or about August 12, 2001. There is no evidence of record that the Defendant would not have continued to provide suitable employment to the Plaintiff as part of the general CNA duties available with Defendant.
 ***********
Based upon the foregoing findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On August 29, 2001, Defendants submitted to the North Carolina Industrial Commission a Form 60 and accepted compensability for the August 12, 2001 incident. At that time, the Defendant became entitled to direct the Plaintiff's medical treatment.
2. A Form 60 does not provide to the Plaintiff a presumption of disability; therefore, while the Form 60 was an admission by the Defendants of the compensability of the Plaintiff's injury, it was not an admission of the Plaintiff's disability. Hence, Plaintiff has the burden of proving that she has sustained a loss of income as the result of the August 12, 2001 injury.
3. The employment offered by Defendant to Plaintiff on October 4, 2001 was suitable employment which the Plaintiff unjustifiably refused. N.C. Gen. Stat. § 97-32.
4. Since Plaintiff unjustifiably refused the suitable employment offered to her by Defendant in October 2001, she is not entitled to temporary total disability compensation benefits nor is Plaintiff entitled to temporary partial disability compensation benefits.
5. As with a Form 60, a Form 62 does not create a presumption of disability in favor of the Plaintiff and it remains the Plaintiff's burden to come forward with evidence to support her claim for partial disability benefits.
6. Plaintiff has not shown entitlement to temporary partial disability compensation benefits and has been overpaid temporary partial disability compensation benefits from November 19, 2001 through June 30, 2002.
7. The Plaintiff has failed to show that her loss of earnings after October 4, 2001 was the result of the August 12, 2001 injury.
8. As a result of the August 12, 2001 accident, Plaintiff has sustained a 5% permanent partial disability to her back. N.C. Gen. Stat. § 97-31.
 ***********
Based upon the foregoing findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to Plaintiff compensation at the rate of $184.57 per week for 15 weeks for the 5% permanent partial impairment to her back which she sustained as a result of the August 12, 2001 accident, subject to a credit awarded Defendant for an overpayment of temporary partial disability benefits. The remaining amount, if any, shall be paid in a lump sum to Plaintiff, less 25% to be deducted and sent to her attorney as an approved attorney fee.
2. Plaintiff is entitled to have the Defendant pay for all related and authorized medical treatment for as long as said treatment effects a cure, gives relief and tends to lessen Plaintiff's period of disability.
3. Defendants shall pay the costs.
This 15th day of December 2004.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER